**People of the State of Illinois, Plaintiff-Appellee, v. Odessa Williams, Defendant-Appellant.**

**Gen. No. 49,706.**

First District, First Division.

September 19, 1966.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Frederick F. Cohn and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James B. Zagel, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

After a bench trial, defendant, Odessa Williams, was found guilty of the offense of unlawful possession of a narcotic drug. She was sentenced to the penitentiary for a term of 5 to 7 years.

On appeal, it is not disputed that defendant was improperly sentenced. For that reason, we consider only defendant's contentions (1) that the evidence was not sufficient to support a finding of guilty; and (2) that there were prejudicial trial errors.

On July 18, 1962, five police officers proceeded to 4042 West Jackson Boulevard, pursuant to a warrant in which were named Odessa Williams and one Johnny B. Four police officers testified that the defendant was present in the apartment when they entered, and that narcotics were found in a chest of drawers in the apartment, which defendant substantially admitted belonged to her. Three witnesses for the defense testified that defendant entered the apartment while "the raid was going on." Defendant denied that there were any narcotic drugs in her apartment.

Officer DeLeo testified that he went to the apartment with Officers Duffy, Mrozek, Donovan and Boyle. Officer Duffy had a search warrant and knocked on the rear door at about two o'clock in the afternoon. Defendant walked out, and Officer Duffy showed her the warrant, and "we walked into the apartment. . . . There were two men sitting in the dining room off the kitchen. These two men were Johnny Rosemont and John B. Cooper. I walked approximately into the bedroom at the far end of the hall. . . . I began a search of the dresser drawers and chest of drawers. I searched the closets of that bedroom. There were female clothes in the closet. In the chest of drawers, a second drawer, I found a package. It was a tinfoil package. I opened the tinfoil package.

In its contents I found a white envelope which contained a white powder substance. . . . Immediately after I found these exhibits, I called Officer Duffy into the bedroom. Present at this conversation was Officer Duffy, myself, and the defendant. Officer Duffy had taken the exhibits from my hand the white substance, and asked her if this belonged to her. She said, 'Everything in here belongs to me, so it must be mine.' Words to that effect."

On cross-examination, Officer DeLeo said, "The narcotics here I found myself. No one was with me when I found them. Officer Duffy was in the bathroom at that time. I was in the apartment for approximately 45 minutes before I found the narcotics. As soon as I entered the apartment, as I testified on direct examination, I walked directly into the bedroom. When I went directly into the bedroom, the defendant was standing at the door talking to Officer Duffy, who showed her the warrant. I walked directly by them. . . . I was searching myself; I'm not positive what the other officers were doing. The tinfoil package was found and inside it was found a white envelope. In the bottom part of the drawer of the chest of drawers a separate 2 sections of the chest of drawers I found the pills, tinfoil wrappings of different sizes of tinfoil. I did not find anything else in the bedroom. I did not find any narcotics in the closet. I found clothing. . . . The clothing was still in packages of the store. The clothing was taken from the closet and inventoried and sent to the Custodian's Office. . . . In my presence Officer Duffy asked the defendant if the narcotics belonged to her. I couldn't say exactly what words Officer Duffy used. But words to the effect, 'Does this belong to you,' indicating the narcotics in his hand. The package was opened at that time. We field tested the package just before she arrived.

"Q. Just before she arrived?

"A. Before he called her in, before he went to get her and brought her back into the apartment.

"Q. Officer, you said, 'Just before she arrived?'

"A. That was a mistake by me, before.

"Q. I heard what you said, you said, 'Just before she arrived' you field tested it. Did you ask the 2 men what their names were?

"A. I did not."

Officer Duffy testified that he had a search warrant for the premises at 4042 West Jackson Boulevard, and the names on the warrant were Odessa Williams and Johnny B. He entered the apartment and found Odessa Williams, Johnny Rosemont and Johnny B. Cooper. "Five officers entered the apartment. At 2:00, four officers and myself entered. . . . I identified myself as a police officer. Then I produced a warrant, and I showed it to Odessa Williams; I handed it to her; she looked at it. I do not know if she read it or not. . . . I went into the bedroom. Officer DeLeo was in there when I went in. He called me in there. . . . He showed me a tinfoil wrapped package. People's Exhibit No. 4 for identification is that package. I had a conversation with Odessa Williams in the bedroom. Officer DeLeo and myself were present. . . . I showed her the package and asked her if this was hers, she said 'Everything in this apartment belongs to me, so it must be mine.' "

On cross-examination, Officer Duffy testified, "I knocked on the door, there was no answer. . . . A few minutes later the door opened up. The defendant was standing at the door. I said 'I am a police officer from the 11th District.' I showed my badge. . . . I said, 'I have a warrant to search the premises here.' I asked her if she was Odessa Williams, and she said she was. . . . When I went to the apartment on July 18, there were only three people present. Odessa Williams,

54

Johnny B. Cooper and Rosemont. There were no other people present. . . . When I went into the bedroom Officer DeLeo showed me a white powder substance and a tinfoil package. He had the tinfoil package in his hand. I field tested it. It turned a slight purple, not a real deep purple. I don't know the name for this type of a test. I have been assigned to the Narcotics Investigation for possibly two years. I conducted this test in the bedroom. Only Officer DeLeo and myself were present. Then Odessa Williams was called in. I went and got her. . . . And I asked her, 'Does this belong to you?' And she said, 'Yes.' I was holding the package when I asked her, 'Does this belong to you?' At the time I asked her the question I did not tell her I had narcotics in my hand. I did not refer to dope or anything of that sort. . . . There was a lot of clothing lying on the bed. And she answered, 'Everything in this house belongs to me, I suppose it does.' Well, that's not exactly what she said; she said, 'Everything in this apartment is mine, belongs to me, so it must be mine.' . . . We never told the defendant that she was also under arrest for theft. Yes, subsequently we did arrest her for theft also. We did not ask her questions concerning the ownership of the clothing which were in her bedroom. Not at that time. We questioned her at the 11th District station with regards to the clothing. She said yes, they were hers. . . . The tinfoil package, after it was field tested, was in my presence all the time. I took it down to the crime laboratory."

Another witness for the State, a police officer who was a registered pharmacist, testified that People's Exhibit 4 contained a substance commonly referred to as heroin.

Defense witnesses were Odessa Williams, John Roseman, Johnny B. Cooper, and Police Officer Mrozek.

Defendant, Odessa Williams, testified that she lived at 4042 West Jackson Boulevard, together with her

three small children. She had left the apartment with her daughter to get some fruit. At that time Arthur Macklin and John Roseman were in the apartment with her sons. "When I came back to the apartment, I saw something unusual. The officer named Duffy . . . came down the alley behind me as my daughter and I came back in. . . . I had to ring the back door bell to get into the apartment. . . . I was assisted in to the apartment by a police officer. . . . the first room I entered was the kitchen and no one was there except the Officer and I. . . . I asked him who he was and what he wanted there. He asked me who I was and I told him my name and that it was my apartment. . . . I was arrested in the later afternoon about 4:00—3:30, maybe 4:00. . . . The tall officer that showed me the search warrant told me that I was under arrest. He said I was under arrest for grand theft; possession of a hypodermic needle. I was not shown any narcotic drugs. There was no mention by any police officer of any drugs. I have not seen People's Exhibit No. 4 before. No police officer showed me this on July 18, 1962. . . . I haven't seen People's Group Exhibit No. 8 before. Certain large pieces of tinfoil, no, I haven't seen those before. No, I haven't seen the smaller pieces before. I wasn't shown any of these exhibits at my house prior to being taken to the station. I wasn't shown anything. . . . On July 18, 1962, I didn't have any narcotic drugs in my apartment. I didn't know that there were any narcotic drugs in my apartment on that date. I didn't have any reason to believe that there were narcotic drugs in my apartment at any place in my apartment on July 18. At no time on July 18, 1962 did I tell any one of the four or five police officers who were present at my home . . . that narcotic drugs in the apartment belonged to me. I have had narcotic drugs in my possession at one time. It was a long time ago. Back in 1953. I was found guilty of possession of narcotic drugs. That was in the year

1953. I served a year for that. I have never been a user of narcotic drugs; I have never used drugs."

A witness for the defense, John Roseman, testified that when the police first entered the apartment, only he and Arthur Macklin were present. "Then there was a knock on the door . . . . After the knock on the door, Odessa came in. No one was with her. Officer Boyle asked her her name. . . . After July 18, 1963, (sic), I was married to Odessa Williams."

Johnny B. Cooper testified that he arrived at the apartment in the afternoon and was admitted by Officer Duffy. Present in the apartment at that time were the officers, John Roseman, Odessa Williams and a man called McCullerton. Cooper slept in the apartment occasionally, and "I used to go to any place in the apartment I wanted to. I wasn't restricted in my movements. . . . I used to go to Odessa Williams' bedroom occasionally. I have gone in to Odessa Williams' chest of drawers. I never put anything in her chest of drawers. I never took anything from the chest of drawers."

Officer Mrozek, called as a defense witness, testified that Odessa Williams, Cooper and Roseman were in the apartment when he entered it. He identified defendant's Exhibit 1 as a report prepared by him.

In rebuttal, Officer Donovan identified Odessa Williams in the courtroom and testified that she was in the apartment when the five officers entered it.

After both sides rested and in final argument, counsel for defendant asserted that the police officers were not telling the truth, and that their testimony "was a complete and out and out frame." In finding defendant guilty, the court remarked, "I can't bring myself to believe that these police officers are completely fabricating all of their testimony. If I so believed, I would have to believe that the execution of this search warrant and the return thereon was a complete and absolute

57

frame by the Police Officers. I simply can't bring myself to that conclusion."

We consider first defendant's contention that during the trial, defense counsel was denied timely use of police reports. Cited is People v. Cole, 30 Ill2d 375, 196 NE2d 691 (1964), where it is said (p 381) :

> "Where it appears that there is evidence in the possession and control of the prosecution favorable to the defendant, a right sense of justice demands that it should be available, unless there are strong reasons otherwise. . . . If contradictory statements were made by the prosecuting witness to these two missing officers then the defendant by all means should have the benefit for impeachment purposes. Justice requires a full and fair disclosure."

█ The record shows that two police reports were given to defendant's counsel at a lunchtime recess, prior to the direct testimony of Officer Duffy, the officer responsible for the reports. These two reports were received in evidence as defendant's exhibits 1 and 2, of which exhibit 2 is in the record. Both reports were used by defendant in the cross-examination of Officer Duffy. The record does not show that defendant's access to and use of these reports was unduly limited. We find no merit to defendant's contention that defendant was denied timely use of police reports necessary for the impeachment of witnesses.

█ We consider next defendant's contention that "the trial court erred in failing to employ a proper standard in adjudging the credibility of the witnesses." We agree with defendant that there is no rule of construction which says that the credibility of a witness may be determined by his profession. We do not agree with the defendant that this record "conclusively demon-

strates that the trial judge was prejudiced in favor of the police."

■■■ In a bench trial in a criminal case, it is for the trial court to weigh the testimony and determine the credibility of the several witnesses. Where the truth lies, in any debatable set of circumstances, is a matter peculiarly for the trier of fact, be it judge or jury, and it is not for a reviewing court to substitute its opinion therefor. In view of the opportunities available to the trial court, the reviewing court will not disturb a guilty finding unless the proof is so unsatisfactory or implausible as to justify a reasonable doubt as to defendant's guilt. People v. Woods, 26 Ill2d 582, 585, 187 NE2d 692 (1963); People v. Evans, 23 Ill2d 302, 305, 178 NE2d 376 (1961).

As to the comments of a trial judge on the credibility of a witness in a bench trial, it is said in People v. Faginkrantz, 21 Ill2d 75, 80, 171 NE2d 5 (1960):

> "Upon such a trial a judge's comments only make explicit what would otherwise be implicit in a finding adverse to the defendant. They thus become a matter of taste, in the absence of a showing of prejudice."

Examining the testimony, we note one conflict in testimony is whether the defendant was present when the police officers entered her apartment. Four officers testified affirmatively. Defendant, Roseman and Cooper testified she arrived later. Defendant asserts the police report (defendant's Exhibit 2) demonstrates that the defendant was not present at the time the police officers entered the apartment. Defendant further notes that during the cross-examination of Officer DeLeo, he said, "We field tested the package just before she arrived."

Another conflict concerns what defendant was referring to when she said, "Everything in this apartment

is mine, belongs to me, so it must be mine." This was in response to a question of Officer Duffy. Officer Duffy testified he showed her the tinfoil package of narcotics. Defendant testified, "I wasn't shown any of these exhibits at my house prior to being taken to the station. I wasn't shown anything."

Examining these conflicts in the testimony and the remarks of the trial judge on the credibility of the witnesses in finding the defendant guilty, we are unable to agree with defendant's contention that the trial judge failed to employ "a proper standard in adjudging the credibility of the witnesses." As the court stated, "I have to believe the Police Officers or I have to believe the defendant." We find nothing in this record to demonstrate that the court was in error in choosing to believe the testimony of the police officers.

As to the proof of defendant's guilt of the offense charged, the determinative question is whether it may be properly inferred from the proof that defendant had both knowledge and control of the narcotics found in her apartment. In People v. Nettles, 23 Ill2d 306, 178 NE2d 361, it is said (pp 308, 309) :

> "Where narcotics are found on the premises under the control of the defendant, this fact, in and of itself, gives rise to an inference of knowledge and possession by him which may be sufficient to sustain a conviction for unlawful possession of narcotics, absent other facts and circumstances which might leave in the mind of the jury, or of the court where a jury is waived, a reasonable doubt as to his guilt. . . . Whether a defendant's account of his possession of narcotics is believed depends on the credibility of the witnesses and the weight to be given their testimony, which are both matters for the trial judge where a jury has been waived."

 Applying these pronouncements to the evidence in this record, we note that it is not disputed that the narcotics in evidence were found in defendant's bedroom in a chest of drawers owned by her. There are no facts or circumstances in this record which militate against an inference of knowledge and possession by defendant, in spite of her denials. The questioning of defendant by Officer Duffy, regarding the package of narcotics held in his hand, can be interpreted as being equivocal, but we are of the opinion that the undisputed facts here give "rise to an inference of knowledge and possession" sufficient to sustain defendant's conviction for unlawful possession of the narcotics.

For the reasons given, the conviction of defendant is affirmed. As the State concedes that defendant was improperly sentenced, defendant's sentence to the penitentiary is reversed and the cause is remanded to the Criminal Division of the Circuit Court of Cook County with directions that defendant be sentenced in compliance with the proper statutory provisions.

Affirmed in part; reversed in part and remanded with directions.

KLUCZYNSKI, P. J. and BURMAN, J., concur.