THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DWIGHT HAWKINS, Defendant-Appellant.

First District (5th Division)   No. 1—89—2699

Opinion filed February 11, 1993.

Michael Pelletier and Anne E. Meyer, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kevin Sweeney, and David Stabrawa, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Following a jury trial, defendant was found guilty of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1) and sentenced to 35 years' imprisonment. On appeal, defendant contends that (1) the trial court's denial of defendant's motion to suppress must be reversed because the court improperly believed the testimony of one witness simply because he was a lawyer and an assistant State's Attorney; (2) the trial court erred in denying defendant's motion *in limine* to bar use of his prior convictions for impeachment; (3) the prosecutor's remarks

in closing argument denied defendant a fair trial; (4) the trial judge's supplemental jury instructions denied defendant a fair trial; and (5) the Illinois murder statutes are unconstitutional. For the reasons set forth below, we affirm.

FACTS

Donald Helms was killed in the early morning hours of June 21, 1988, on the sidewalk in front of an apartment building at 6226 S. Woodlawn Avenue in Chicago. Defendant Dwight Hawkins was arrested shortly thereafter and charged by indictment with first degree murder.

Prior to trial, defendant filed a motion to suppress oral statements he made to the arresting officers at the time of his arrest, as well as oral statements made to an assistant State's Attorney during questioning later that morning. Defendant contended that he was not advised of his *Miranda* rights prior to interrogation, that he was obviously intoxicated during the interrogation, and that the interrogation was continued after he requested an attorney.

At a hearing held on the motion on December 1, 1988, defendant testified that he was arrested at 2 or 2:30 a.m. in the hallway outside his third-floor apartment at 6226 S. Woodlawn. According to defendant, he was not informed of his *Miranda* rights when he was arrested. The arresting officers told him he was charged with aggravated battery. Defendant also testified that he was intoxicated at the time, having consumed a 40-ounce bottle of malt liquor and a pint of wine by himself and having shared a six-pack of beer and a liter of wine with the deceased in the two hours prior to his arrest.

Defendant stated that the arresting officers handcuffed him and together they walked down the stairs from the third floor. Defendant conceded that he was able to walk down the stairs without assistance.

The defendant further testified that he was taken to the police station where he was interviewed approximately six to eight hours later. Although he had slept on the floor of a cell during the time since his arrest, defendant was tired, not feeling well, and still intoxicated when he was interviewed. At the interview, defendant explained to the State's Attorney the events of the previous night. Defendant testified that no *Miranda* warnings were given, and he did not ask for an attorney until the State's Attorney informed him that the victim had died. Although asked to, defendant did not sign a written statement, but indicated instead that he wanted an attorney to advise him of his rights. No attorney was provided.

The State called as its first witness at the suppression hearing Officer Karen Carson of the Chicago police department. Carson testified that she, her partner, Officer Guerrero, and two sergeants arrested defendant at approximately 2:40 a.m. on June 21, 1988, outside defendant's third-floor apartment at 6226 S. Woodlawn. According to Carson, she advised defendant of his *Miranda* rights outside the apartment door, before the police and defendant went downstairs. Defendant indicated he understood his rights.

Carson further testified that she conducted no interrogation of defendant at the scene. When defendant and the police walked by the victim's body on the sidewalk, however, defendant responded.

Carson also testified that although she smelled alcohol on defendant's breath, he had no trouble getting down the stairs from his third-floor apartment. In Carson's opinion, defendant was not intoxicated.

The testimony of Officer Ronald Guerrero was substantially the same as that of his partner, Officer Carson.

Detective Al Greifsheim, who interviewed the defendant at the police station the morning following his arrest, also testified at the hearing. According to Greifsheim, Assistant State's Attorney Edward McCarthy, who was also present at the interview, read defendant his *Miranda* rights. Although no written waiver was obtained, defendant said he understood his rights and agreed to speak with the detective and assistant State's Attorney. In Greifsheim's opinion, defendant was not under the influence of alcohol.

Greifsheim further testified that the interview lasted for over an hour. At the end of that time, the assistant State's Attorney informed defendant that the victim had died. Greifsheim stated that defendant then declined to sign a written statement and for the first time requested an attorney. The interview terminated.

The final witness at the suppression hearing, Assistant State's Attorney McCarthy, also testified about the interview of defendant at the police station. McCarthy's testimony substantially corroborated that of Greifsheim.

The court denied defendant's motion to suppress his statements made to the police immediately following his arrest and the next morning. In denying the motion, the court stated that it had reviewed its notes on a number of occasions, paying particular attention to defendant's testimony. The court rejected defendant's contention that he was intoxicated, noting that defendant's memory of the event was good. Defendant admitted he was able to walk down from his apartment without assistance. The court also noted that all other witnesses

had testified that defendant's speech was not slurred and that defendant seemed to have no difficulty understanding what was going on.

The court also found that defendant had spoken freely and voluntarily after being given his *Miranda* warnings. The court stated "I can't, for the life of me, disbelieve both Officer Greifsheim and Mr. McCarthy, that they did not give the Miranda Warnings. Mr. McCarthy, especially, has a ticket that he is zealously guarding, and that ticket is his right to practice law." The court also credited the testimony of Officers Carson and Guerrero over that of the defendant that *Miranda* warnings were given at the time of the arrest.

The trial began on August 1, 1989. Prior to jury selection, argument was heard on defendant's motion *in limine* seeking to prevent the use at trial of his prior convictions. At issue were convictions for theft dating from May 17, 1979; for possession of a stolen motor vehicle dating from August 3, 1979; for aggravated battery, theft, and possession of a stolen motor vehicle dating from October 10, 1980; and for misdemeanor theft dating from September 13, 1982. The court ruled that the May 17, 1979, conviction would be excluded because it was beyond the 10-year limitation set forth in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695. As to the other convictions, the court stated that it was exercising its discretion and would allow those convictions to be disclosed because possession of a stolen motor vehicle and theft reflected on defendant's basic honesty. The court also ruled that the 1980 aggravated battery conviction would be admissible because it believed that "the jury should be aware of all the motivations that the defendant might have for telling the truth or not telling the truth."

The State's first witness was Yvonne McGill. She testified that at approximately 2:20 on the morning of June 21, 1988, she was leaving the building at 6226 S. Woodlawn with a friend who lived in the building, when a car drove up. Defendant, who had been driving, and the victim got out of the car. McGill testified that the victim was staggering and was drunk. McGill also testified that she had seen the victim several hours earlier, at about 11 p.m. At that time, the victim was arguing with a woman.

McGill further testified she heard defendant say "man, I'm fixing kill me a m-----f-----," and asked a man standing nearby to get him a stick. McGill testified that the defendant started beating the victim in the stomach, thighs, and legs. He hit the victim 10 or 15 times. The victim fell down and defendant hit him on the forehead five or six times, cracking the victim's skull. Defendant continued to beat the victim with the stick while the victim was on the ground, and also

stomped on the victim in the groin area. According to McGill, the victim did not attack the defendant, nor could he because he was too drunk to fight.

McGill further testified that she ran to the corner to flag down a police car. She told the police that defendant had gone into the apartment building.

On cross-examination, McGill denied ever telling the police that defendant got out of the passenger side of the victim's car. She also denied telling the police that the victim and the defendant were arguing when they drove up. She also denied telling the police that defendant said that the victim had hit him.

The State's next witness was Chicago police officer Karen Carson. She testified that early on June 21, 1988, she and her partner went to 6230 S. Woodlawn, where they found the victim lying on the sidewalk. The victim was bleeding from the nose, ears and mouth. He had bruises all over his arms and there appeared to be a bone jutting out from his chin. Three to five feet away was a 2 by 4, approximately three feet long, which appeared to have blood on it. There were also wood chips nearby.

Carson testified that after speaking with Yvonne McGill, she and her partner went to the third-floor apartment at 6226 S. Woodlawn, where McGill had indicated that the offender could be found. When the officers knocked, defendant opened the door, was arrested, cuffed, and informed of his *Miranda* rights. He was wearing cut-off blue jeans and no shirt. Carson observed a couple of small scratches on defendant's left shoulder. The keys to the victim's car were in defendant's pocket. Carson testified that she detected the odor of alcohol on his breath.

Carson further testified that as she and the defendant were walking past the victim lying on the sidewalk, the defendant looked at the victim and said "yes, I did that. He had it coming."

Mitra Kalekar, a deputy medical examiner, also testified for the State. His examination of the victim revealed eight injuries about the head and face. He also testified that the victim's jaw bone was protruding from the right side of his chin. Kalekar testified that the victim also had eight injuries to his trunk, four to his arms, two to the left leg and one on his buttocks. Kalekar further testified that the bony surface at the base of the victim's skull was extensively fractured. The victim also suffered fractures of his upper and lower jaws and of three ribs. In Dr. Kalekar's opinion, the cause of death was multiple injuries to the body due to blunt trauma. Laboratory tests revealed the victim's blood-alcohol level to be .308.

Assistant State's Attorney Edward McCarthy also testified for the prosecution. McCarthy testified that he interviewed defendant on the morning of June 21, 1988, at the third district police station. Detective Greifsheim was also present at the interview. Defendant told McCarthy that around midnight, after getting off work, defendant had bought a six pack of beer and was drinking it on the front porch of a building in the 6200 block of South Woodlawn. At that time, a car pulled up in front of the building and a man, the victim, and a woman got out of it. McCarthy testified that defendant told him that the man approached and asked if the building needed any work because he was a carpenter and was looking for work. The man offered defendant a beer which defendant accepted.

McCarthy further testified that defendant told him that the victim and the woman started to argue, and the woman walked over to the car and took the license plates off the car. Defendant also told McCarthy that he and the victim drove back to the victim's apartment to get some money for more drinks. They had a drink at the apartment, but after an argument began, defendant asked the victim to drive him home. The victim said he was not ready to leave and punched the defendant in the shoulder. McCarthy also testified that the defendant unsuccessfully looked around the apartment for something with which to hit the victim.

According to McCarthy, defendant told him that the victim eventually drove back to the 6200 block of Woodlawn, and that, on the way, the victim repeatedly apologized for hitting him. The defendant, however, was still angry for being punched. Defendant also told McCarthy that when they arrived at defendant's apartment, he reached across from the passenger's side of the car and pulled the keys from the ignition because he did not want the victim to get away. After they were out of the car, defendant asked someone standing on the sidewalk to give him something, and was handed a 2 by 4, with which he began beating the victim. McCarthy testified that defendant never said that he was in fear for his life or that he was defending himself.

At the close of the State's case in chief, defendant moved for a mistrial. The motion was denied.

Defendant called as his first witness retired Detective Al Greifsheim of the Chicago police department. Greifsheim testified that Yvonne McGill said that she heard defendant say that the victim had hit him. McGill also told Greifsheim that defendant had gotten out of the passenger side of the victim's car, not the driver's side as McGill had previously testified. She also told him that she saw defendant strike the victim in the knees.

Greifsheim also testified regarding his and Assistant State's Attorney McCarthy's interview of defendant. Greifsheim did not recall defendant saying that he had looked around the victim's apartment for something with which to hit the victim. Nor did Greifsheim recall defendant saying that he took the victim's car keys to prevent the victim from getting away.

Defendant testified in his own defense. On June 20, 1988, he got off work at 10 p.m. He testified that he bought a 40-ounce bottle of malt liquor and a pint of wine on the way home. Around midnight, he was drinking with neighbors on the front porch of his apartment building when a man, whom defendant later learned to be Donald Helm, approached him asking if he knew the owner of the building and if the owner might be interested in hiring a carpenter. Approximately 20 minutes later, a woman arrived, who Helm said was his wife. Defendant testified that the victim and his wife had some words, calling one another four-letter names. According to defendant, the argument was heated, and the victim and his wife hit each other. The fight lasted approximately five minutes, at which time the woman walked to a car parked in the street. The victim followed, and the argument continued by the car for another five minutes. The victim then returned, acted like nothing happened and offered defendant another beer. The victim and defendant also shared a liter of wine.

When the wine was gone, defendant and the victim drove in the victim's car to his apartment to get money for more wine and beer. Defendant testified that although he went upstairs with the victim, he did not go inside the victim's apartment. Two minutes later when the victim came back out to the hallway, they met a neighbor of the victim. Defendant testified that he said he would wait downstairs by the car, which he did for almost half an hour. At that time, defendant went back into the building, where he heard the victim and his neighbor arguing and "cussing one another out." Defendant returned to the car, and 10 to 15 minutes later, the victim came outside looking upset.

Defendant further testified that the victim walked towards him and "out of left field" hit the defendant in the jaw. Although the victim was "ranting and raving about something," defendant could not understand what the victim was so upset about. Defendant said that in 1981 he was working at a filling station and was shot during a robbery and that the bullet was not removed and remained between his ear and his jaw. He explained that he was afraid that if he was hit, the bullet could move.

Defendant also said that when he was hit he was afraid and upset and said that he did not want to fight and started to walk away. He was a car length away when he heard footsteps, turned and put up his hands to defend himself. The victim apologized, said he was not mad at defendant but was mad at his wife and at others. Defendant testified that he accepted the victim's offer of a ride home because it was late, the buses only ran every other hour and he had to be at work in the morning.

The victim drove back to defendant's apartment. On the way, the victim said he was going to look for his wife and run her over with her car. When defendant tried to calm the victim down, the victim told defendant not to get in his business, that this was a matter between the victim and his wife. When they arrived at defendant's apartment, the victim threw the car into park and "backhanded" defendant in the mouth. The men got into a wrestling match in the car, and defendant was struck in the shoulder and neck by the car keys the victim held in his hand. Defendant testified that he was mad, upset and afraid because the victim was bigger and stronger than he was. The victim was 6 feet 2 inches tall and weighed about 200 pounds. Defendant testified that he was 5 feet 8 and weighed about 145 pounds. He believed that the victim was dangerous and that he was "in real trouble."

When defendant got out of the car, the victim also got out and began chasing defendant, "cussing, telling me what he was going to do to me." A gentleman standing on the sidewalk handed defendant a board. When the victim swung at him, defendant hit him with the board. The victim kept coming, and defendant hit him again. Defendant testified that he hit the victim three or four times. When the victim fell to the ground, defendant dropped the board and went upstairs to his apartment, where he was arrested shortly thereafter.

Defendant testified that he had no intention of trying to kill the victim and that the force used was needed.

On cross-examination, defendant stated that after the victim hit him outside the victim's apartment, the defendant walked rather than ran away, and stopped when the victim called to him. Defendant conceded that he was not afraid for his life at that time, but he was nervous. Defendant also testified that when he got out of the car in front of his apartment, he walked at a fast pace but did not run towards his apartment. Defendant was afraid of being hurt, but not killed, by the victim. The victim followed, and although both men had been drinking, neither had any problems walking. Defendant testified that when

the victim tried to hit him, defendant started hitting. The victim kept coming, and defendant swung the board again.

The final witness was Regina Ford, the victim's girl friend. She testified to the victim's violent nature. In June of 1987, the victim had "jumped on her" in a restaurant and smashed her head into a wall during an argument. She required eight stitches. That same month, the victim had slapped her and knocked her down in their apartment. The victim also knocked down his sister when she tried to help. In another episode, Ford pulled an ice pick on the victim, who grabbed it and bent it all the way back. Another time, the victim pulled her out of a car and began kicking her. He also knocked his mother down on that occasion. Ford explained that the victim became abusive every time he drank. Some instances of abuse followed arguments the victim had with other people.

On June 20, 1988, Ford saw the victim drink a six-pack and some Richard's Wild Irish Rose. They drove to the 6200 block of South Woodlawn, and the victim went to the porch with his drinks. Ford testified that she tried to persuade him to go, but he refused and swore at her. Ford testified that she pulled out a razor when defendant walked up to her. He backed down and she left.

In rebuttal, the State offered defendant's prior convictions by stipulation.

Following closing arguments, the jury retired to deliberate. During its deliberations, the jury sent a note to the judge concerning one of its instructions. The jury had been given two instructions on mitigating factors. The first read:

> "A mitigating factor exists so as to reduce the offense of first degree murder to the lesser offense of second degree murder if at the time of the killing the defendant believes that circumstances exist which would justify the deadly force he uses, but his belief that such circumstances exist is unreasonable."

The second mitigating factor instruction read:

> "A mitigating factor exists so as to reduce the offense of first degree murder to the lesser offense of second degree murder if at the time of the killing the defendant acts under a sudden and intense passion resulting from serious provocation by the deceased. Serious provocation is conduct sufficient to excite an intense passion in a reasonable person."

The jury had underlined the term "serious provocation" on the second instruction and had placed an asterisk above "serious." Then, in the handwriting of someone from the jury was written "If we determine a person is unreasonable, is this a mitigating factor?" Below this

question was an asterisk and "We are having a problem understanding this phrase and how to interrupt [sic] it."

Defendant urged that the court should merely tell the jurors that they had been given a definition of mitigating factor involving unreasonable belief. Over defendant's objection, the court responded in writing as follows:

"It is for you, the jury, to determine if the conduct of an unreasonable person satisfys [sic] the definition of a mitigating factor and if the defendant has presented evidence of the mitigating factor to preponderate on that issue.

As to the second question, put another way—

Is the conduct in this case relating to the issue of serious provocation, sufficient to excite an intense passion in a reasonable man.

You must determine whether the conduct would excite an intense passion, whether the passion is intense, and whether the conduct would excite what you determine to be a reasonable man.

Please reread all the instructions if you think you may have missed the significance of any instruction."

The jury returned a verdict finding the defendant guilty of first degree murder, and the court subsequently sentenced him to 35 years' imprisonment. Defendant appeals.

OPINION

We first address defendant's contention that the trial court erred in denying his motion to suppress statements. Defendant argues that the trial court improperly believed the testimony of one of the State's witnesses simply because the witness was a lawyer and an assistant State's Attorney. While defendant acknowledges that, if believed, the testimony of the State's witnesses was sufficient to support the trial judge's denial of his suppression motion, he contends that the trial court resolved the question of witness credibility on an improper factor, namely the fact that the State's witness was an assistant State's Attorney and a lawyer.

It is not error for a trial judge, at the close of the evidence in a bench trial, to comment on the credibility of the witnesses. *People v. Kennedy* (1989), 191 Ill. App. 3d 86, 91, 547 N.E.2d 634 (in a bench trial "at the close of the evidence, a trial judge may comment upon the credibility of the witnesses"); *People v. Williams* (1966), 75 Ill. App. 2d 50, 59, 221 N.E.2d 48 ("[u]pon such a trial a judge's com-

ments only make explicit what would otherwise be implicit in a finding adverse to the defendant").

In assessing credibility, the trier of fact may consider the witness' occupation as a factor bearing on credibility. (*People v. Winchester* (1933), 352 Ill. 237, 244, 185 N.E. 580 ("[i]t was proper for defendant to bring out this fact on cross-examination as a matter affecting the credibility of the witness"); *People v. Bond* (1917), 281 Ill. 490, 499, 118 N.E. 14 ("It is permissible to inquire of a witness as to his or her occupation. If a witness is engaged in a disreputable occupation, in justice and fairness he should not be permitted to appear before the jury as a person of high character who is engaged in a lawful and respectable occupation"); *People v. Surwaka* (1971), 2 Ill. App. 3d 384, 391, 276 N.E.2d 490 ("[i]t is proper to show a witness' occupation [clergyman] as reflecting on his credibility").)

Error will be found, however, if the record demonstrates that the trial judge based his determination of credibility upon preconceived notions regarding certain witnesses (*People v. Kennedy*, 191 Ill. App. 3d at 91 ("the trial judge harbored preconceived notions regarding the veracity of the defense witnesses which led him to reject defendant's alibi defense without due consideration"), was prejudiced for or against certain witnesses (*People v. Williams*, 75 Ill. App. 2d at 58-59 (record did not "conclusively demonstrate[ ] that the trial judge was prejudiced in favor of the police")), or relied on matters outside the record. *People v. Kennedy*, 191 Ill. App. 3d 86, 547 N.E.2d 634.

■ Here, a review of the record in its entirety indicates that the trial judge based his decision on the evidence presented at the hearing. The court carefully reviewed all the evidence, specifically noting that it "paid particular attention to when the defendant testified." The court explicitly stated that it did not believe the defendant's testimony that both the assistant State's Attorney and the arresting police officers failed to read him his rights. The court also disbelieved the defendant's testimony regarding his intoxication, stating "I believe that the defendant was not as drunk as he said he was." The record does not indicate that the trial judge was prejudiced or held any preconceived notions regarding the credibility of either the State's or defendant's witnesses. Rather, the court considered all the testimony and credited that of the State's witnesses over that of the defendant.

Questions of credibility are to be resolved by the trier of fact. (*People v. Davis* (1983), 97 Ill. 2d 1, 452 N.E.2d 525; *People v. Davis* (1983), 95 Ill. 2d 1, 447 N.E.2d 353.) As a reviewing court, we will not substitute our judgment for that of the trier of fact. (*People v. Williams*, 75 Ill. App. 2d 50, 221 N.E.2d 48.) When reviewing a trial

court's determination on a motion to suppress, we will not overturn that determination unless it is against the manifest weight of the evidence. (*People v. Davis*, 97 Ill. 2d at 20; *People v. Davis*, 95 Ill. 2d at 25; *People v. Mallett* (1970), 45 Ill. 2d 388, 396, 259 N.E.2d 241.) The trial court, after hearing the witnesses, was entitled to disbelieve the defendant's version of what had happened. There was no error in its ruling.

The cases cited by defendant in support of his argument are not controlling. Those cases involved assertions made by prosecutors to juries in closing argument to the effect that statements of police officers are presumptively credible in that police officers would not lie. (See *People v. Clark* (1989), 186 Ill. App. 3d 109, 542 N.E.2d 138; *People v. Rogers* (1988), 172 Ill. App. 3d 471, 526 N.E.2d 655; *People v. Ford* (1983), 113 Ill. App. 3d 659, 447 N.E.2d 564; *People v. Parker* (1979), 72 Ill. App. 3d 679, 391 N.E.2d 89.) As to such statements, the courts correctly held that police officers should not be presumed to tell the truth, and their credibility should be evaluated as any other witness. In contrast, here the comments were made by the court in a bench trial, at the close of the evidence and in the context of expounding upon the court's decision. These comments by the court in explaining its findings need not be construed to indicate that the trial judge prejudged credibility based upon occupation, or that he failed to consider other relevant factors such as demeanor, internal consistency and the like in his ultimate evaluation of credibility.

We turn next to defendant's contention that the trial court erred in denying his motion *in limine* to prevent use of his prior convictions for impeachment purposes. He argues that because the likelihood for unfair prejudice far exceeded their minimal probative value, these convictions should have been excluded. Defendant also contends that his August 3, 1979, conviction for possession of a stolen vehicle was one day beyond the 10-year limit established in *Montgomery* and as a result *per se* inadmissible.

In *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, our supreme court adopted proposed Rule 609 of the Federal Rules of Evidence concerning admissibility of a criminal defendant's prior convictions for impeachment purposes. This rule, as set forth in *Montgomery*, provides:

> "(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime, except on a plea of *nolo contendere,* is admissible but only if the crime, (1) was punishable by death or imprisonment in excess of one year under the law under which he was con-

victed, or (2) involved dishonesty or false statement regardless of the punishment unless (3) in either case, the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice.

(b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of conviction or of the release of the witness from confinement, whichever is the later date." (*Montgomery*, 47 Ill. 2d at 516.)

The court went on to state that where a prior conviction is found to bear on a defendant's credibility, the trial court must exercise its discretion in admitting such a conviction based upon whether the court finds that the prejudicial value of admission substantially outweighs any possible probative value for impeachment. The court set forth several factors which might be considered by the trial court in making its determination, including "the nature of the crime, nearness or remoteness, the subsequent career of the person, and whether the crime was similar to the one charged." (*Montgomery*, 47 Ill. 2d at 518.) Once the party seeking admission of a prior conviction establishes that it satisfies the first portion of the rule, "the burden of persuasion to demonstrate that the prejudicial effect of such evidence substantially outweighs its probative value falls to the party seeking its exclusion." (*People v. Medreno* (1981), 99 Ill. App. 3d 449, 451, 425 N.E.2d 588.) The time limit set forth in subdivision (b) of the rule imposes only an outer limit upon the trial court's determination and does not restrict its decision within that limit. (*Montgomery*, 47 Ill. 2d at 519.) With these principles in mind, we examine each of defendant's convictions which he contends was erroneously admitted.

The first is his August 3, 1979, conviction for possession of a stolen motor vehicle. Defendant argues that this conviction was *per se* inadmissible because, although the motion *in limine* was considered and ruled on on August 1, 1989, defendant did not testify until August 3, 1989, thus making this conviction one day beyond the 10-year limit of *Montgomery*. (See *People v. Thibudeaux* (1981), 98 Ill. App. 3d 1105, 1113, 424 N.E.2d 1178 ("evidence of the prior conviction is inadmissible if the conviction *** was more than 10 years before the giving of his testimony").) The State, in response, argues that the first day of a period should be excluded from the calculation (Ill. Rev. Stat. 1985, ch. 1, par. 1012), making this conviction exactly 10 years old and therefore not necessarily inadmissible under *Montgomery*. Although we agree with defendant that this conviction should have been excluded as too remote in time under *Montgomery* (see *People v. Wil-*

*liams* (1987), 159 Ill. App. 3d 612, 623, 513 N.E.2d 415 (prior conviction which occurred 9 years 10 months earlier among factors considered by court in reversing conviction)), we would not consider its admission to be reversible error, since in light of the other properly admitted convictions, any prejudice from the improper admission of this conviction would be minimal. See *People v. Vaughn* (1978), 56 Ill. App. 3d 700, 371 N.E.2d 1248 (improperly admitted prior conviction not grounds for reversal where evidence would not have influenced jury verdict).

The 1980 and 1982 convictions for theft and possession of a stolen motor vehicle were relevant to defendant's veracity. (*People v. Spates* (1979), 77 Ill. 2d 193, 395 N.E.2d 563; *People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821.) They were also within the time limitations of *Montgomery*. The question, therefore, is whether their probative value was substantially outweighed by their potential prejudicial impact.

The question of defendant's credibility was crucial. He was the only person who could testify to the events that transpired between the defendant and the victim while they were in the car or at the victim's apartment. He was also the only person who could testify to his fear of the victim, his belief that force was necessary to prevent being attacked by the victim and his fear that a bullet lodged in his jaw might become dislodged. In such a case, the witness' credibility is critical to the determination of the truth, thus enhancing the probative value of defendant's prior convictions used to impeach that credibility. (See *People v. Medreno*, 99 Ill. App. 3d at 453 (where defendant could produce no other witnesses to establish his defense, "his credibility was of the utmost importance to the jury's search for the truth" and "[e]xclusion of a prior conviction could have deprived the State of using the only effective means of questioning his credibility").) As to the potential prejudice from the admission of these convictions, defendant has offered nothing other than the risk inherent in informing a jury that the defendant had previously been convicted of a felony. As a result, defendant has not met his burden of demonstrating that the prejudicial effect of the admission of these convictions outweighs their probative value.

As to defendant's 1980 conviction for aggravated battery, it would be admissible under *Montgomery* insofar as it is for a crime punishable by imprisonment in excess of one year and less than 10 years have elapsed since the conviction. Here too, therefore, the question becomes one of balancing its probative value against its prejudicial effect. The statements made earlier regarding probative value apply

equally to this conviction. The aggravated battery conviction, however, would seem to have a greater potential for prejudice than would convictions for theft or possession of a stolen motor vehicle, due to its similarity to the crime charged. (*People v. Pruitt* (1988), 165 Ill. App. 3d 947, 952, 520 N.E.2d 867 (" 'strong reasons arise for excluding those [prior convictions] which are for the same crime because of the inevitable pressure on lay jurors to believe that "if he did it before he probably did so this time." As a general rule, those convictions should be admitted sparingly' "), quoting *Gordon v. United States* (D.C. Cir. 1967), 383 F.2d 936, 940; see also *People v. Williams* (1987), 159 Ill. App. 3d 612, 622, 513 N.E.2d 415 ("similarity often invites an improper inference of guilt rather than directs attention to the defendant's credibility").) In addition to the inherent similarity between the aggravated battery conviction and the crime for which defendant was on trial, at the hearing on defendant's motion defense counsel noted another similarity: Apparently a baseball bat was used in the aggravated battery. The trial court was therefore aware of the potential prejudice when it denied defendant's motion *in limine*. The court specifically ruled that no evidence would be allowed regarding the baseball bat. It is apparent from the record that the court carefully considered the relevant factors, including the similarity of the conviction and the charge at issue, and in the exercise of its discretion, determined to admit this conviction. (Compare *People v. Williams*, 159 Ill. App. 3d at 622-23 (admission of prior convictions held to be error, based in part on fact that record did not indicate that trial court balanced the probative value of the proffered evidence with its potential prejudice).) Accordingly, although we would not necessarily have reached the same determination as the trial judge, we find no abuse of discretion in the admission of this conviction for impeachment purposes.

We consider next defendant's contention that certain remarks made by the prosecutor during closing argument operated to deny him a fair trial. Defendant urges that the prosecution distorted the burden of proof and improperly shifted it to defendant, giving the jurors the impression that they must convict defendant if they did not believe him. In addition, defendant contends that it was a misstatement of the law for the State to tell the jury that defendant had an obligation to run away from the victim and to suggest that defendant could not have acted in self-defense because he did not say that he was afraid for his life.

■■ Initially, the State argues that defendant has waived objection to most of the allegedly erroneous comments by the failure to object

or to raise the issue in his post-trial motion. Defendant concedes as much, but urges that we consider the comments as plain error. (See *People v. Crossno* (1981), 93 Ill. App. 3d 808, 824, 417 N.E.2d 827 ("In criminal cases in which the evidence is closely balanced, [our supreme court] has held that [we] may consider errors that have not been properly preserved for review").) A serious misstatement of the law may require reversal where the evidence is close, even when the defendant fails to object at trial. (*People v. Eckhardt* (1984), 124 Ill. App. 3d 1041, 1043, 465 N.E.2d 107.) Here, however, it cannot be said that the evidence of defendant's guilt was close. Although defendant argues that the evidence of his guilt was not overwhelming since the only genuine issue at trial was his state of mind at the time of the homicide, and only he provided direct evidence on that issue, there was substantial evidence from other witnesses which tended to refute defendant's testimony in this regard. Officer Carson testified that when she and the defendant walked by the victim's body on the sidewalk, defendant said "yes, I did that. He had it coming." Yvonne McGill testified that when defendant and the victim got out of the victim's car, the defendant said "man, I'm fixing kill me a m----f----." She also testified that defendant asked a bystander for a stick with which he repeatedly beat the victim, even after the victim was on the ground. According to McGill, the victim did not attack defendant and was too drunk to do so. Although defendant testified that he only hit the victim three or four times, testimony by the medical examiner established that the victim had eight injuries to the head and face, eight injuries to his trunk, four to his arms, and one injury on his buttocks. The base of the victim's skull was fractured, as were his upper and lower jaws and three ribs. The victim's jawbone was protruding from his chin. As a result of this overwhelming evidence of defendant's guilt, review of the alleged errors to which defendant failed to object or include in his post-trial motion is not required under the plain error doctrine. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124; *People v. Cunningham* (1988), 177 Ill. App. 3d 544, 553, 532 N.E.2d 511.

Moreover, even if not waived, we would conclude that any errors which did occur do not require reversal of defendant's conviction. The prosecution is allowed great latitude in closing argument, and the scope of closing argument is left largely to the trial court. (*People v. Shum* (1987), 117 Ill. 2d 317, 351, 512 N.E.2d 1183.) Reversible error will be found when the comments were such that, without their having been made, the jury might have reached a different result. (*People v. Estes* (1984), 127 Ill. App. 3d 642, 650, 469 N.E.2d 275 ("[t]he test

for determining whether the remarks of the prosecutor in closing argument constitute reversible error is whether those comments were such that, without their having been made, the jury might have reached a different result"); see also *People v. Lawler* (1990), 194 Ill. App. 3d 547, 559, 551 N.E.2d 779 (reversal required where court could not say "that the prosecutor's improper argument did not contribute to defendant's conviction").) Although we find that some of the prosecutor's comments were erroneous, they do not constitute reversible error.

It is improper for the prosecution to distort the burden of proof by suggesting incorrectly what the jury must find to reach a particular verdict (*People v. Wilson* (1990), 199 Ill. App. 3d 792, 797, 557 N.E.2d 571), or to erroneously tell the jury that in order to acquit the defendant, it must find that the State's witnesses were lying. (*People v. Ridley* (1990), 199 Ill. App. 3d 487, 493, 557 N.E.2d 378.) It is also a misstatement of the law to tell the jurors that a defendant has an obligation to run away. (*People v. Moore* (1976), 43 Ill. App. 3d 521, 526, 357 N.E.2d 566 ("One does not have [a duty] to retreat from a place where he has [the] right to be"); see also *People v. Estes*, 127 Ill. App. 3d at 649 (error for prosecution to "[p]lac[e] the suggestion before the jury that the defendant had a duty to retreat").

The remarks at issue here include the following:

"In deciding this issue of whether or not doing this to Donald Helm is justified in the eyes of the law, and in your eyes as the as the conscience of the community, they [*sic*] are going to have to consider all the evidence. Consider that only two witnesses who testified in this case, who were there when Donald Helm was killed, were Yvonne McGill and Dwight Hawkins. All the other witnesses, they just add circumstantially to this case.

You have to decide this case. Who to believe. Do you believe what Yvonne told you a couple of days ago, or do you believe Dwight Hawkins?

\* \* \*

But Yvonne McGill's testimony should be believed because she comes in here and tells the truth, but she's the only witness that was presented in this case. When you are deciding who to believe, look at which of these two people, either Yvonne or the defendant, when they tell you what happened. Which of these two people has other evidence that you can look at in this case that corroborates what they are saying?"

By these remarks, the prosecutor effectively told the jury that it had to choose to believe either Yvonne McGill or the defendant. If it be-

lieved McGill, it should find the defendant guilty, while if it believed the defendant, it should acquit. As such, they distorted the burden of proof and were improper. *Wilson*, 159 Ill. App. 3d 792, 557 N.E.2d 571; *Ridley*, 199 Ill. App. 3d 487, 557 N.E.2d 378.

Later, in rebuttal responding to defense counsel's argument that the defendant was faced with a dilemma, the prosecutor stated:

> "He can't get away from that man? He can't run away? He has that obligation. It's not like he was cornered in some blind alley next to a dumpster, and this guy's coming at him, and the only thing that's in his reach is this instrument here."

Telling the jurors that defendant had an obligation to run away was a misstatement of the law. *Estes*, 127 Ill. App. 3d 642, 469 N.E.2d 275; *Moore*, 43 Ill. App. 3d 521, 357 N.E.2d 566.

While the prosecutorial errors here constitute serious breaches, we are still bound by the harmless error and waiver rules. As discussed above, the evidence of defendant's guilt was overwhelming. There is no question, from the perspective of the entire record, that these errors were not outcome determinative or materially contributed to defendant's conviction. (See *People v. Willis* (1991), 210 Ill. App. 3d 379, 382, 569 N.E.2d 113 (error in considering defendant's failure to retreat did not require reversal since court concludes that defendant's conduct in stabbing victim 10 additional times was not justified as necessary self-defense).) As noted above, there was considerable evidence other than defendant's failure to retreat which negated his claim of self-defense, including the testimony of McGill and that of the medical examiner concerning the multiple injuries suffered by the victim. As we cannot say that had the comments not been made the jury might have reached a different result, these improper remarks do not require reversal. *People v. Sawczenko* (1989), 180 Ill. App. 3d 406, 414-15, 535 N.E.2d 1105 ("to constitute reversible error, the remarks must have substantially prejudiced defendant such that absent those remarks the verdict would have been different").

Defendant also assigns as error the trial court's supplemental jury instruction given in response to the jury's question. He contends that the response given to the jury's question contained an erroneous statement of the law in that it allowed the jury to determine for itself what constituted a mitigating factor.

When a jury requests clarification, the court has a duty to respond when the original instructions are incomplete and the jurors are manifestly confused. (*People v. Reid* (1990), 136 Ill. 2d 27, 39, 554 N.E.2d 174.) Where supplemental instructions are given, a misstate-

ment of law will constitute reversible error. *People v. Lipscomb* (1977), 46 Ill. App. 3d 303, 305, 360 N.E.2d 988.

The defendant concedes that the supplemental instruction accurately reflected the law to the extent it informed the jury that it must determine whether he had proved the existence of a mitigating factor by a preponderance of the evidence in order to convict him of second degree murder. He argues, however, that by telling the jurors that it was for them to determine whether the conduct of an unreasonable person was a mitigating factor, the judge gave the jury license to ignore the statutory elements of second degree murder and to decide for itself what facts constituted the lesser offense of second degree murder. Defendant contends that the supplemental instruction erroneously suggested to the jurors that, even if they made the factual determination that defendant unreasonably believed that his conduct was justified, they were free to go further and make the legal determination that this was not a mitigating factor. We disagree.

■ Defendant interprets the judge's response as if it referred to the first mitigating factor instruction involving a defendant's unreasonable belief in the need for force. In point of fact, however, the jury's questions were written on the instruction which defined the "sudden passion" or "serious provocation" mitigating factor. Logically, therefore, the jury's questions and the court's response must be considered in the context of that instruction, a part of which stated "serious provocation is conduct sufficient to excite an intense passion in a reasonable person." The question "if we determine a person is unreasonable, is this a mitigating factor?" when read in light of the instruction involved, would indicate that the jury had already determined that the defendant's conduct was unreasonable. The court's response, that it was for the jury to determine whether the conduct of an unreasonable person satisfied the definition of a mitigating factor, simply told the jurors that even if they determined this defendant to be unreasonable, they should examine the evidence to determine whether the provocation involved would be sufficient to arouse an intense passion in a reasonable person. The court then went on to rephrase the term "serious provocation." The jurors were not left to ignore the statutory definition of mitigating factor, but rather were to consider whether the conduct involved here amounted to "serious provocation," thereby satisfying the definition given of the "sudden passion" mitigating factor. We also note that the court in its response instructed the jury "to reread all the instructions if you think you may have missed the significance of any instructions." This further ne-

gates any concerns the jurors were given license to ignore or modify any previous instruction.

Finally, we reject defendant's contention that the Illinois second-degree murder statute is unconstitutional. The arguments presented by defendant here have been previously considered by this court, and the statute has consistently been held constitutional. See, *e.g., People v. Mitchell* (1991), 221 Ill. App. 3d 926, 583 N.E.2d 78; *People v. Davis* (1991), 221 Ill. App. 3d 1023, 583 N.E.2d 64; *People v. Guidry* (1991), 220 Ill. App. 3d 406, 581 N.E.2d 38; *People v. Willis* (1991), 217 Ill. App. 3d 909, 577 N.E.2d 1215; *People v. Doss* (1991), 214 Ill. App. 3d 1051, 574 N.E.2d 806.

For all the above reasons, we affirm.

Affirmed.

MURRAY and COUSINS, JJ., concur.