THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ORLANDO M. JAMES, Defendant-Appellant.

Third District   No. 3—05—0172

Opinion filed June 16, 2009.

McDADE, J., dissenting.

Thomas A. Karalis (argued), of State Appellate Defender's Office, of Ottawa, for appellant.

Terence M. Patton, State's Attorney, of Cambridge (Terry A. Mertel and Gary F. Gnidovec (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SCHMIDT delivered the opinion of the court:

The defendant, Orlando M. James, was charged with unlawful possession of cocaine with intent to deliver (720 ILCS 570/401(a)(2)(B) (West 2002)) and unlawful possession of cocaine (720 ILCS 570/402(a)(2)(B) (West 2002)). The trial court denied his motion to suppress the evidence. In a bench trial, the court found the defendant guilty on both counts. The court ruled that the latter count merged into the former and sentenced him, *inter alia*, to 17 years of imprisonment and to pay a $3,000 drug assessment fee. On appeal, the defendant argued that: (1) the trial court erred by denying his motion to suppress; and (2) he is entitled to a $5-per-day credit against his drug assessment fee for the days he was in presentence incarceration. In a 2007 order, this court, with one justice dissenting, reversed and remanded on the motion to suppress issue. *People v. James*, No. 3—05—0172 (2007) (unpublished order under Supreme Court Rule 23). In doing so, the majority relied on the "scope of the stop" prong of *People v. Gonzalez*, 204 Ill. 2d 220, 789 N.E.2d 260 (2003). The State sought review of that order in the supreme court.

On November 26, 2008, the Illinois Supreme Court issued a supervisory order directing us to vacate the 2006 order and to reconsider in light of *People v. Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603 (2008). *People v. James*, 229 Ill. 2d 681, 896 N.E.2d 1060 (2008). Accordingly, we hereby vacate the 2006 order. Upon reconsideration, we affirm as modified.

## I. BACKGROUND

At the hearing on the motion to suppress, Henry County Deputy Sheriff Glenn Hampton testified that, during the early morning hours of November 14, 2002, he observed a car following another vehicle too closely on Interstate 80. Hampton stopped the car, which was driven

by Anthony Oliver, and in which the defendant was the only passenger.[1]

Hampton said that he approached the driver's side of the vehicle and asked Oliver for his driver's license. Oliver gave Hampton an Illinois state identification card. The officer placed Oliver in the passenger seat of the squad car while he ran a background check on Oliver's card. The dispatcher informed Hampton that Oliver did not have a valid Illinois driver's license.

In response to Hampton's questions, Oliver stated that he had problems with his license because of an error by the Secretary of State's office. Hampton did not arrest Oliver, but instead told him that he needed to resolve the situation with the Secretary of State's office.

At some point while Oliver was in the squad car, Hampton approached the defendant to determine whether he had a valid driver's license. The defendant told Hampton that he did not have his driver's license with him. The defendant provided Hampton with his name and date of birth.

Using this information from the defendant, Hampton ran a background check to determine whether the defendant had a valid driver's license. The dispatcher informed Hampton that the defendant had a valid license and that he was on mandatory supervised release from the Department of Corrections. Hampton was not told why the defendant had been incarcerated. After Hampton received the information regarding Oliver, the vehicle, and the defendant, Hampton returned Oliver's card and informed him that he was free to go, but only if the defendant drove the car.

Then, Hampton asked Oliver if there were any weapons or contraband in the vehicle. Hampton testified that he was suspicious of "a very strong smell of an aroma, of some sort of fragrance, real strong," coming from inside the vehicle. Hampton stated that vehicles transporting illegal drugs sometimes use strong fragrances as masking agents.

Oliver told Hampton that there were no weapons or contraband in the vehicle. In response, Hampton asked Oliver whether he was certain of that. Oliver said that he was certain, but also told Hampton that he could search the vehicle if he wished. Hampton took Oliver's statement as consent to search the vehicle.

Hampton next approached the passenger side of the vehicle and asked the defendant to exit the vehicle. Hampton told the defendant

---

[1]The defendant and Oliver were tried separately. They each filed a motion to suppress in their respective cases. By agreement of the parties, the trial court held a joint hearing on the motions from the separate cases.

that Oliver had consented to a search of the vehicle and also asked the defendant for consent to search. According to Hampton, the defendant consented.

Next, Hampton told Oliver to stand at the front of the car he had been driving. The officer also told the defendant to stand at the front of the squad car, which was situated behind the vehicle in which he had been the passenger. Hampton then searched the interior of the car. The only item Hampton found in the passenger compartment was a liquor bottle containing the fragrance that was emanating from the vehicle.

Hampton then asked both the defendant and Oliver for their consent to search the trunk. At this point, both Oliver and the defendant were still at the respective locations where they previously had been told to stand by Hampton. Both the defendant and Oliver gave their consent to search the trunk. During this search, Hampton found a plastic baggie containing cocaine in a wheel well of the trunk.

Oliver later gave a voluntary written statement to Hampton, stating that he was taking the cocaine to a party, but that he did not intend to sell the cocaine. He also stated that he was "ready to leave the streets" and to give up using drugs.

Oliver testified that he was driving the car on Interstate 80 on the morning in question. The defendant was in the passenger's seat. The vehicle belonged to the defendant's wife. Oliver stated that he was in the left lane, passing a truck that was in the right lane. Hampton's squad car was turning around in a U-turn area on the interstate. Oliver passed Hampton, and Hampton began to follow the vehicle. Hampton then pulled the car over.

Hampton approached the driver's side and asked Oliver for his license. Oliver responded that he only had a state identification card because someone in Connecticut had been using his name. Hampton then placed Oliver in the squad car.

Hampton ran a background check on Oliver's card, which came back as suspended. Hampton exited the squad car and approached the defendant, who gave Hampton his information orally because he did not have his driver's license with him. Hampton returned to the squad car and ran a background check on the defendant's information. Hampton then returned Oliver's card and told him that he was free to go. Oliver stated that he felt free to go at that point.

Hampton next informed Oliver that he was going to search the vehicle and that, if there was nothing illegal in the vehicle, the defendant would have to drive. Hampton then asked Oliver if there were guns or drugs in the vehicle. Oliver said Hampton never asked him whether he could search the vehicle. Oliver stated that his door

was locked and that he no longer felt free to leave after Hampton said he was going to search the vehicle.

Hampton exited the squad car and approached the defendant, whom he asked to exit the vehicle. Hampton returned and asked Oliver to exit the squad car. Hampton placed Oliver at the front of the vehicle and the defendant at the rear. Hampton then began to search the vehicle.

After Hampton searched the passenger compartment, he opened the trunk and began to search it. Oliver stated that Hampton did not ask him for consent to search the trunk and that he did not hear Hampton ask the defendant for consent to search the trunk.

During his search of the trunk, Hampton rose up with his gun drawn and told Oliver to "freeze" and to put his hands on his head. Hampton then made Oliver walk around to the back of the vehicle, where he cuffed Oliver and the defendant.

Oliver stated that his written statement was untrue. He stated that Hampton told him what to write because he wished to "impress the State" in order to get the intent charge dropped. Additionally, Oliver stated that Hampton encouraged him to talk to the defendant regarding the incident to ensure they had the same version of what happened. In rebuttal, Hampton denied telling Oliver what to write and denied encouraging Oliver to talk to the defendant regarding the incident.

The defendant testified that, on the morning in question, he was the passenger in his wife's vehicle. Oliver was driving. Hampton pulled them over and approached the driver's side of the vehicle. Oliver rolled the window down, and Hampton said he pulled the car over for following another vehicle too closely.

Oliver gave Hampton a state identification card, and Hampton took Oliver back to the squad car while he ran the check on Oliver's card. About 10 minutes later, Hampton approached the defendant and asked him for his driver's license. The defendant said that he had a license, but that he did not have it on him. The defendant then gave Hampton his personal information, and Hampton returned to the squad car.

Hampton returned about 10 minutes later with Oliver walking slightly behind him. Hampton asked the defendant to exit the vehicle and told Oliver to go to the front of the vehicle. Hampton then asked the defendant if he had any contraband on him, to which the defendant said, "No." Hampton asked for and received the defendant's consent to search his person. Hampton then placed the defendant at the rear of the vehicle.

Next, Hampton began searching the vehicle's interior. The defendant stated that Hampton never asked if the officer could search

the vehicle and that he never heard Hampton ask Oliver if the officer could search the vehicle. After searching the interior, Hampton began searching the trunk. He opened the trunk with the key. Again, the defendant stated that Hampton did not ask for consent to search the trunk and that he did not hear Hampton ask Oliver for consent to search the trunk.

With regard to the events surrounding Oliver's written statement, the defendant stated that Hampton told him that Hampton knew the State's Attorney personally and that Hampton was going to try to help them out by getting the intent charge dropped. The defendant also stated that Hampton told him that he needed to "follow-up" with Oliver's version of what happened in order to convince the State's Attorney to drop the intent charge and that Hampton actually told him several parts of Oliver's version. The defendant stated that Hampton placed him in the same room with Oliver for five minutes to "talk it over."

On April 4, 2003, the trial court denied the defendant's motion to suppress. In its written order, the court made a number of factual findings that were consistent with Hampton's testimony. Among these findings, the court stated that both Oliver and the defendant had given their consent to the search of the car, contrary to their testimony. The court also said that both Oliver and the defendant were free to go when Hampton made the request to search the vehicle and that Hampton did not illegally detain them prior to requesting consent to search. Accordingly, the court held that the consents of both Oliver and the defendant had been voluntarily given.

At the bench trial, Hampton offered testimony similar to his testimony at the suppression hearing. At the conclusion of the bench trial, the court found the defendant guilty on both counts. The record shows that the defendant was in custody for 501 days before he was sentenced.

## II. ANALYSIS

### A. Motion to Suppress

On appeal, the defendant contends that the trial court erred by denying his motion to suppress because Hampton illegally detained him following the traffic stop, thereby tainting the subsequent search that resulted in the discovery of cocaine in the trunk of the vehicle.

In *Cosby*, our supreme court reiterated that the ruling of a trial court on a motion to suppress frequently presents mixed questions of fact and of law. *Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603. A trial court's findings of fact will not be disturbed unless they are manifestly erroneous, and its ultimate decision concerning whether to grant the motion is reviewed *de novo*. *Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603.

The fourth amendment of the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Article I, section 6, of the Illinois Constitution provides similar protections. Ill. Const. 1970, art. I, §6. Illinois courts have interpreted the search and seizure language found in section 6 in a manner consistent with the Supreme Court's fourth amendment decisions. *People v. Caballes*, 221 Ill. 2d 282, 851 N.E.2d 26 (2006).

In *Cosby*[2], the Illinois Supreme Court emphasized that searches and seizures that occur incident to traffic stops are no longer to be analyzed by the three-tiered test found in *Gonzalez*, 204 Ill. 2d 220, 789 N.E.2d 260. The *Cosby* court noted that once a traffic stop has ended, the question becomes whether a second seizure has occurred when an officer requests consent to search the vehicle. *Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603. The court analyzed this question under the principles found in *United States v. Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980), and *People v. Brownlee*, 186 Ill. 2d 501, 713 N.E.2d 556 (1999).

■ The *Mendenhall* court stated that a person is seized when, either by physical force or by a show of authority, his freedom of movement is restrained. *Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870. The Court gave examples of circumstances that might indicate a seizure to be: (1) the threatening presence of several officers; (2) an officer's display of a weapon; (3) physical touching of the defendant by an officer; and (4) an officer's use of language or tone of voice to indicate that compliance may be compelled. *Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870.

■ Citing *Mendenhall*, the *Brownlee* court observed that a person is seized when, considering all of the facts and circumstances concerning the incident, a reasonable person would not feel free to leave. *Brownlee*, 186 Ill. 2d 501, 713 N.E.2d 556. If an officer has neither

---

[2]We note that this is a fourth amendment case. There are United States Supreme Court cases on point. Our supreme court directed this court to reconsider in light of *Cosby* and, for that reason, our analysis focuses on *Cosby*. *Cosby* obviously does not change fourth amendment jurisprudence. Rather, *Cosby* and *People v. Harris*, 228 Ill. 2d 222, 886 N.E.2d 947 (2008), bring Illinois back in line with United States Supreme Court fourth amendment jurisprudence. We assume the Illinois Supreme Court directed us to vacate the original order and reconsider in light of *Cosby* because *Cosby* was its most recent pronouncement that the "scope of the stop" portion of the *Gonzalez* test, relied on by the majority in our 2006 disposition, previously had been rejected by the United States Supreme Court in *Illinois v. Caballes*, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005).

probable cause nor a reasonable, articulable suspicion of criminal activity, the officer's show of authority constitutes an unconstitutional seizure of the person. *Brownlee*, 186 Ill. 2d 501, 713 N.E.2d 556.

The *Mendenhall* court also noted that the crucial question is whether a defendant's seizure at the time he was asked for consent to search meant that the consent was coerced and, therefore, was involuntary. *Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870. If the consent to search was involuntarily given, any evidence obtained as a result of the search would be tainted as the fruit of the poisonous tree. See *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *Brownlee*, 186 Ill. 2d 501, 713 N.E.2d 556.

We acknowledge that the testimony of Hampton, Oliver, and the defendant varied regarding the events that transpired between the beginning of the traffic stop and the defendant's arrest. However, the trial court made factual findings that were consistent with Hampton's testimony. The court also found that Oliver and the defendant were free to go when Hampton asked for consent to search the vehicle. The court implicitly found Hampton's testimony to be more credible than the testimony of either Oliver or the defendant. See *People v. Hawkins*, 243 Ill. App. 3d 210, 611 N.E.2d 1069 (1993) (court making finding adverse to the defendant is implicit credibility finding in favor of the State). Therefore, we will rely on Hampton's version of events in applying the facts of this case to our legal analysis.

■ As the *Cosby* court noted, once the traffic stop ended, the central question became whether a second seizure occurred when Hampton requested consent to search the vehicle. See *Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603. In the present case, the traffic stop ended when, in the squad car, Hampton determined that the defendant had a valid driver's license and told Oliver that he was free to go so long as the defendant drove.

Then, while still seated in the squad car, Hampton asked Oliver if: (1) there were any weapons or any contraband in the vehicle; and (2) whether he was certain. Merely asking such questions did not constitute a seizure of Oliver. See *Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870.

Next, without Hampton asking Oliver for consent to search the car, Oliver volunteered that Hampton could search the vehicle. Because Oliver had been the driver of the car, he had authority to consent to the search of the vehicle. See *People v. Harris*, 199 Ill. App. 3d 1008, 557 N.E.2d 1277 (1990). Therefore, Oliver's unsolicited consent was a valid, voluntary consent for Hampton to search the car. Furthermore, Oliver's unsolicited consent included consent to search the trunk. See

*People v. Gutierrez*, 243 Ill. App. 3d 867, 612 N.E.2d 111 (1993). Moreover, Oliver's unsolicited consent was valid regardless of whether Hampton sought the consent of the defendant, who was: (1) a passenger in the car; and (2) not the owner of the vehicle (defendant's wife owned the car). See *Harris*, 199 Ill. App. 3d 1008, 557 N.E.2d 1277.

Next, we will determine whether any of Hampton's actions after he received Oliver's consent would have invalidated that consent. After Hampton received Oliver's unsolicited consent, Hampton asked the defendant to exit the vehicle. Hampton was permitted to require the defendant to exit the vehicle during the search, for the officer's safety. See *Maryland v. Wilson*, 519 U.S. 408, 137 L. Ed. 2d 41, 117 S. Ct. 882 (1997); *People v. Gonzalez*, 294 Ill. App. 3d 205, 689 N.E.2d 1187 (1998). Thus, Hampton's removal of the defendant from the car did not invalidate Oliver's consent to search the vehicle.

After the defendant exited the vehicle, Hampton asked: (1) the defendant for consent to search the car; (2) Oliver for consent to search the trunk; and (3) the defendant for consent to search the trunk. However, all of Hampton's further requests to search were redundant after Hampton received the initial valid, unsolicited consent to search from Oliver. See *Harris*, 199 Ill. App. 3d 1008, 557 N.E.2d 1277. Even if we were to consider, *arguendo*, whether any of these subsequent requests constituted a second seizure, the answer is negative because the record does not show the presence of any *Mendenhall* factors (see 391 Ill. App. 3d at 1051) during these requests. See *Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870.

In summary, the evidence presented at the suppression hearing showed that Hampton obtained unsolicited, voluntary consent to search the vehicle, including the trunk, from Oliver. Whether Hampton later requested consent to search from the defendant was irrelevant. See *Harris*, 199 Ill. App. 3d 1008, 557 N.E.2d 1277. If anything, the request to search the trunk would send the message to a reasonable person that he could refuse the request and the officer would stop searching. Hampton did not seize the cocaine in violation of defendant's fifth amendment rights. See *Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870. Therefore, we hold that it was neither against the manifest weight of the evidence nor error as a matter of law for the trial court to deny the defendant's motion to suppress.

## B. Monetary Credit

■ The defendant submits that he is entitled to a $5-per-day credit against his $3,000 drug assessment fee for the days he was in presentence incarceration. The State agrees.

A criminal defendant is entitled to a $5 credit for each day he is in presentence custody to be applied against any fines imposed by the court. 725 ILCS 5/110—14 (West 2006). This $5 credit is applicable to drug assessment fees. *People v. Reed*, 376 Ill. App. 3d 121, 875 N.E.2d 167 (2007).

In this case, the record shows that the defendant was in presentence custody for 501 days. His sentence included a $3,000 drug assessment fee. The defendant did not receive a $5-per-day credit against his drug assessment fee. Therefore, we rule that the defendant is entitled to a credit of $2,505 against his $3,000 drug assessment fee.

## III. CONCLUSION

For the foregoing reasons, we affirm the Henry County circuit court's judgment of conviction and modify the defendant's sentence by applying a credit of $2,505 against his $3,000 drug assessment fee.

Affirmed as modified.

LYTTON, J., concurs.

JUSTICE McDADE, dissenting:

This appeal is before us because of a supervisory order of the Illinois Supreme Court, directing this court to vacate and reconsider its previous order in this appeal, *People v. James*, No. 3—05—0172 (2006) (unpublished order under Supreme Court Rule 23) (166 Ill. 2d R. 23), in light of the supreme court's recent holding in *People v. Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603 (2008), which overruled the court's previous decision in *People v. Gonzalez*, 204 Ill. 2d 220, 789 N.E.2d 260 (2003), to the extent it held that the reasonableness of a traffic stop must be judged by whether the officer's conduct altered the fundamental nature of the stop. We originally found that the trial court erred in denying defendant's motion to suppress. Upon reconsideration, the majority affirms the trial court's denial of defendant's motion to suppress. Because I believe *Cosby* is both factually distinguishable and does not represent a change in the law that requires reversal of our prior decision, I dissent.

In our previous order, we found that: (1) "defendant was not free to go while Oliver was in the squad car being questioned by Hampton"; and (2) Hampton's actions "both prolonged the detention and changed the fundamental nature of the stop." *People v. James*, No. 3—05—0172 (2006) (unpublished order under Supreme Court Rule 23) (166 Ill. 2d R. 23). Thus, we reversed the trial court's denial of defendant's motion to suppress. *People v. James*, No. 3—05—0172 (2006)

(unpublished order under Supreme Court Rule 23) (166 Ill. 2d R. 23). Here, the majority finds that: (1) "traffic stops are no longer to be analyzed by the three-tiered test found in *Gonzalez*" (391 Ill. App. 3d at 1051); (2) "the traffic stop ended when, in the squad car, Hampton determined that the defendant had a valid driver's license and told Oliver that he was free to go so long as the defendant drove" (391 Ill. App. 3d at 1052); and (3) Hampton's actions after the stop ended did not constitute a second seizure and that Oliver's consent to search the vehicle was therefore legal (391 Ill. App. 3d at 1051-53).

At the outset, I would like to call attention to the misleading nature of the majority's statement that "traffic stops are no longer to be analyzed by the three-tiered test found in *Gonzalez*." 391 Ill. App. 3d at 1051. This statement appears to imply that *Gonzalez* has been overruled in its entirety. A reading of *Cosby*, however, rebuts this implication. In *Cosby*, the State charged Michael Cosby with unlawful possession of drug paraphernalia and unlawful possession of cocaine, resulting from a search of Cosby's vehicle and a cigarette pack belonging to Cosby. Prior to trial, Cosby filed a motion to suppress. The trial court denied the motion to suppress and the appellate court reversed. On appeal, the supreme court discussed the proper test to apply when attempting to determine whether police questioning during a "seizure" implicates fourth amendment principles. *Cosby*, 231 Ill. 2d at 273-76, 898 N.E.2d at 610-12. In doing so, the court overruled its previous decision in *Gonzalez*, but only to the extent it held that the reasonableness of a traffic stop must be judged by whether the officer's conduct altered the fundamental nature of the stop. *Cosby*, 231 Ill. 2d at 276, 898 N.E.2d at 612. Specifically, the court stated:

> "We have very recently held in *People v. Harris*, 228 Ill. 2d 222, 240[, 886 N.E.2d 947] (2008), that our decision in *Gonzalez* has been 'unequivocally overruled' by the United States Supreme Court's decision in *Muehler v. Mena*, 544 U.S. 93, 161 L. Ed. 2d 299, 125 S. Ct. 1465 (2005). As we noted in *Harris*, *Muehler* makes clear that the Court, in *Caballes*, rejected the reasoning that led to this court's adoption of the ' "fundamental alteration of the nature of the stop" ' portion of the ' "scope" ' prong of *Gonzalez* and that all that remains of the scope prong is the ' "duration" ' portion of that analysis. [Citation.] Thus we overruled *Gonzalez* to the extent it holds that the reasonableness of a traffic stop must be judged by whether the officer's conduct altered the fundamental nature of the stop. [Citation.]" *Cosby*, 231 Ill. 2d at 276, 898 N.E.2d at 612.

Clearly, the majority of the three-tiered test discussed in *Gonzalez* is still applicable when examining the propriety of searches and seizures that occur incident to a traffic stop. While the majority seems

to imply otherwise, *Cosby* merely overruled the " ' "fundamental alteration of the nature of the stop" ' " portion of the scope prong. *Cosby*, 231 Ill. 2d at 276, 898 N.E.2d at 612. Thus, after *Cosby*, the analytical framework used to determine whether police questioning during a seizure violates the fourth amendment is as follows:

> "First, with respect to *Terry*'s scope requirement, a court must determine whether the questioning is related to the initial justification for the stop. If the questioning is so related, no fourth amendment violation occurs. If the questioning is not reasonably related to the purpose of the stop, the court must determine whether the officer had a reasonable, articulable suspicion that would justify the questioning. If so, there is no fourth amendment violation. In the absence of a reasonable, articulable suspicion, the court must consider whether, in light of the totality of the circumstances, the questioning impermissibly prolonged the detention \*\*\*. [The 'alteration of the fundamental nature of the stop' portion of the scope prong is no longer viable.]" *Cosby*, 231 Ill. 2d at 275, 898 N.E.2d at 612.

While the *Cosby* court specifically set out the applicable test when determining whether police questioning during a seizure violates the fourth amendment, the court ultimately did not apply this test. Instead, the court determined that the initial seizure had ended and thus the relevant question before it was whether a second seizure had occurred. *Cosby*, 231 Ill. 2d at 276, 898 N.E.2d at 612. One must first determine whether a seizure has occurred prior to determining whether an officer's questioning during the seizure violates the fourth amendment. See *Cosby*, 231 Ill. 2d at 276, 898 N.E.2d at 612. Specifically, the court stated:

> "The appellate court in Cosby's case found that the traffic stop was unreasonably prolonged. While [defendants] argue[ ] before this court that there was no break between the conclusion of the traffic stop and the officer's request for consent to search, we conclude that the record does not support such an argument. The requests for consent to search in both the instant cases followed the officers' returning of the defendants' paperwork. At that point, the traffic stop came to an end. The relevant question is whether the officers' actions after the initial traffic stops had concluded constituted a second seizure of either defendant." *Cosby*, 231 Ill. 2d at 276, 898 N.E.2d at 612.

The *Cosby* court analyzed this question under the principles found in *United States v. Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980), and *People v. Brownlee*, 186 Ill. 2d 501, 713 N.E.2d 556 (1999). The *Mendenhall* Court stated that a person is seized when, either by physical force, or by a show of authority, his freedom of

movement is restrained. *Mendenhall*, 446 U.S. at 553, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877. The Court gave examples of circumstances that might indicate a seizure had occurred: (1) the threatening presence of several officers; (2) an officer's display of a weapon; (3) physical touching of the defendant by an officer; and (4) an officer's use of language or tone of voice to indicate that compliance may be compelled. *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877. Citing *Mendenhall*, the *Brownlee* court observed that a person is seized when, considering all of the facts and " 'circumstances surrounding the incident, a reasonable person would [not] believe[ ] that he was *** free to leave.' " *Brownlee*, 186 Ill. 2d at 517, 713 N.E.2d at 564, quoting *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877. If an officer has neither probable cause nor a reasonable, articulable suspicion of criminal activity, the officer's show of authority constitutes an unconstitutional seizure of the person. *Brownlee*, 186 Ill. 2d at 517, 713 N.E.2d at 564.

Upon examining the principles announced in *Mendenhall* and *Brownlee*, the *Cosby* court found that no second seizure took place. Specifically, the court stated:

> "Accordingly, applying the principles of *Brownlee* and *Mendenhall*, we conclude that Cosby was not seized and that his consent to search his car was therefore voluntary. The trial court's decision denying Cosby's motion to suppress was therefore not in error." *Cosby*, 231 Ill. 2d at 284-85, 898 N.E.2d at 617.

Here, the majority employs the same approach found in *Cosby* to a materially different fact situation. Specifically, the majority finds that "the traffic stop ended when, in the squad car, Hampton determined that the defendant had a valid driver's license and told Oliver that he was free to go so long as the defendant drove." 391 Ill. App. 3d at 1052. Upon making this finding, the majority then undertakes a cursory review of the factors announced in *Mendenhall* in an attempt to determine whether a second seizure took place.

The majority's premise is wrong, however, in light of the fact that its position that the traffic stop ended when Hampton told Oliver that he was free to go is both contradictory and legally incorrect. While I recognize that we have vacated our previous order regarding this appeal, I note that we originally found that "defendant was not free to go while Oliver was in the squad car being questioned by Hampton." *People v. James*, No. 3—05—0172 (2006) (unpublished order under Supreme Court Rule 23) (166 Ill. 2d R. 23). Again, an individual is seized for purposes of the fourth amendment when the circumstances are such that a reasonable person, innocent of any crime, would conclude that he was not free to leave. *People v. Lopez*, 229 Ill. 2d 322,

346, 892 N.E.2d 1047, 1061 (2008). Moreover, our previous order placed great significance upon the fact that Hampton's repeated questions to Oliver regarding whether there were any weapons or contraband in the vehicle "occurred after what *should* have been the termination of the traffic stop."[3] (Emphasis added.) *People v. James*, No. 3—05—0172 (2006) (unpublished order under Supreme Court Rule 23) (166 Ill. 2d R. 23).

I am perplexed as to why, absent any change in facts, the opposite position—that the seizure of defendant ended at the point where Hampton told Oliver he was free to leave—has now garnered a majority. Beyond the fact that the facts leading to our previous position that "defendant was not free to go while Oliver was in the squad car being questioned by Hampton" have not changed, the majority's *new* finding simply defies logic.

Pursuant to Hampton's order, Oliver was sitting in the passenger seat of Hampton's squad car. Immediately after being told he was free to leave, but while still *locked* (according to Oliver the door was locked)[4] in the squad car, Hampton asked Oliver whether there were any weapons or contraband in the vehicle. Oliver answered, "No." Apparently, Oliver's direct answer did not satisfy Hampton so Hampton asked Oliver, while he was still in the locked police car, if he was sure. Oliver's response to this question, given while still seated in the locked car, was that he was sure, but Hampton could search if he wanted to. Clearly, no reasonable person sitting in a closed and locked squad car being questioned by a police officer about weapons or contraband would feel free to just leave. Moreover, it is ridiculous to assume that Hampton would have stood idly by if Oliver simply unlocked and opened the squad door, exited the squad and decided not to answer Hampton's question. Even an individual who is fully aware of his or her legal rights would hesitate to take those steps that the majority apparently feels Oliver (or any reasonable person) would have felt free to take.

The majority, however, ignores these contextual facts and instead focuses solely upon the fact that Hampton, at one point during the encounter, told Oliver he was free to leave. In doing so, however, the majority has incorrectly applied the law. Both the United States

---

[3]Hampton's repeated questions whether there were any weapons or contraband in the vehicle came almost immediately after he told Oliver he was free to leave.

[4]Although the argument gains weight if Oliver was correct that the door was locked, it retains its substance even if the door was only closed and not locked.

Supreme Court and our supreme court have specifically instructed us on numerous occasions that we must look at "all of the circumstances surrounding the incident" when determining whether a reasonable person would feel free to leave. *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877; *Lopez*, 229 Ill. 2d at 346, 892 N.E.2d at 1061; *Brownlee*, 186 Ill. 2d at 517, 713 N.E.2d at 564. We do not look solely at one isolated statement by the arresting police officer. In this case, the totality of the circumstances should tell us that Oliver remained seized, that the duration of the traffic stop was unreasonably prolonged, and his consent was *not* voluntary.

But what about defendant? I do not believe defendant was free to leave during the time Oliver was in the squad car being questioned by Hampton, so I conclude the seizure never ended as to him either. I reach that conclusion for the following reasons. Defendant was a passenger in the car being driven by Oliver. He was seized when Hampton made the traffic stop and took Oliver to the squad car. Hampton inquired about his driver's license and defendant would reasonably have anticipated that the officer would learn that he was on mandatory supervised release. Defendant was not privy to and could not know that Hampton had told Oliver he was free to leave. He was not privy to and could not know that Hampton had conditioned Oliver's release on defendant driving the car, thus implicitly authorizing him to drive even though he was not in possession of his driver's license. What defendant did know was that he was sitting, by direction of a police officer, in a car that he carried no license to drive, that the driver of the car was detained by the officer in the squad car, and that if he drove away in the car, he would be violating the law while on mandatory supervised release. No reasonable person in defendant's position would have felt free to leave. Thus, defendant, too, remained seized.

It is on this basis that I disagree with the majority's analysis of this case, which incorrectly attempts to determine whether a second seizure occurred after Hampton told Oliver he was free to leave. Instead, the pertinent question in the instant case is whether the seizure, which never ended, violated the fourth amendment. In order to answer this question, we need to apply the three-tiered test the *Cosby* court set out but did not apply because it found the original seizure had ended when the officers returned the defendants' paperwork and no second seizure subsequently took place. See *Cosby*, 231 Ill. 2d at 276-85, 898 N.E.2d at 612-17.

In our previous decision we first determined that the questioning of defendant and the subsequent search were not reasonably related to the initial justification for the stop. *People v. James*, No. 3—05—

0172 (2006) (unpublished order under Supreme Court Rule 23) (166 Ill. 2d R. 23). We then found that the record failed to establish a reasonable, articulable suspicion that would justify the questioning. *People v. James*, No. 3—05—0172 (2006) (unpublished order under Supreme Court Rule 23) (166 Ill. 2d R. 23). Finally, we examined the scope prong of the analysis and found that Hampton's actions "both prolonged the detention and changed the fundamental nature of the stop." *People v. James*, No. 3—05—0172 (2006) (unpublished order under Supreme Court Rule 23) (166 Ill. 2d R. 23). While I recognize that the " ' "alteration of the fundamental nature of the stop" ' " portion of the scope prong is no longer viable, the duration prong still exists. *Crosby*, 231 Ill. 2d at 276, 898 N.E.2d at 612. The duration prong is now the sole focus of the scope inquiry. *Harris*, 228 Ill. 2d at 244, 886 N.E.2d at 961. Thus, if a court finds, as we previously did, that the questioning ultimately and impermissibly prolonged the detention (*People v. James*, No. 3—05—0172 (2006) (unpublished order under Supreme Court Rule 23) (166 Ill. 2d R. 23)), any consent and subsequent search resulting from the questioning is tainted, and the fruits thereof should be suppressed. *People v. Brownlee*, 186 Ill. 2d 501, 519, 713 N.E.2d 556, 565 (1999).

The majority here affirms the trial court's denial of defendant's motion to suppress on the grounds that Hampton's questions to Oliver after he told Oliver he was free to leave did not create a second seizure, and none of the *Mendenhall* factors indicative of a seizure were present. 391 Ill. App. 3d at 1051-53. The majority's argument misses the point. As discussed above, the majority's position is based upon the incorrect conclusion that the seizure came to an end at the point when Hampton told Oliver that he was free to leave. While I recognize Hampton also told defendant he was free to leave, this statement was only given after defendant provided Hampton with his name and date of birth. More importantly, however, the driver of the vehicle, Oliver, was locked in Hampton's squad car at the time Hampton told defendant he was free to leave. As we previously found, "defendant was not free to go while Oliver was in the squad car being questioned by Hampton." *People v. James*, No. 3—05—0172 (2006) (unpublished order under Supreme Court Rule 23) (166 Ill. 2d R. 23).

Thus, unlike the situation in *Cosby*, the seizure in the present case did not end. We, therefore, are not faced with the same question the *Cosby* court was faced with, specifically, whether the police "actions after the initial traffic stop[ ] had concluded constituted a second seizure of *** defendant." *Cosby*, 231 Ill. 2d at 276, 898 N.E.2d at 612. It is on this basis that I disagree with the majority's finding that *Cosby* requires us to affirm the trial court's denial of defendant's mo-

tion to suppress. Instead, beyond eliminating one, but not both, of our scope findings, I believe *Cosby* does not negate our original determination that the trial court erred in denying defendant's motion to suppress.

Again, our previous holding found that: (1) Hampton's questioning was not related to the initial justification for the stop; (2) Hampton lacked a reasonable, articulable suspicion that would justify the questioning; and (3) Hampton's questioning impermissibly prolonged the detention. *People v. James*, No. 3—05—0172 (2006) (unpublished order under Supreme Court Rule 23) (166 Ill. 2d R. 23). The facts involved in this case have not changed since the entry of our original order. Nor has any dispositive change in the law taken place since the entry of our original order.[5] I therefore adhere to my original position that "Oliver and defendant were illegally detained at the time they gave consent to the search." *People v. James*, No. 3—05—0172 (2006) (unpublished order under Supreme Court Rule 23) (166 Ill. 2d R. 23). Thus, the search was tainted and the fruits thereof should have been suppressed. See *Brownlee*, 186 Ill. 2d at 519, 713 N.E.2d at 565.

For the foregoing reasons, I would reverse and remand the trial court's denial of defendant's motion to suppress.

---

[5] I acknowledge that the supreme court has found that "the alteration of the fundamental nature of the stop" portion of the scope prong is no longer viable and all that remains of the scope prong is the "duration" portion of that analysis. This change does not affect this particular case upon reconsideration, however, because we have already found that Hampton's questioning impermissibly prolonged the detention. *People v. James*, No. 3—05—0172 (2006) (unpublished order under Supreme Court Rule 23) (166 Ill. 2d R. 23).